IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> ANTHONY JACOB LUGO, <br><br> Defendant. | CR 19–17–BU–DLC <br><br><br> ORDER |

Before the Court is Anthony Jacob Lugo's Motion to Suppress. (Doc. 19.) Lugo is charged in the indictment with possession of a firearm made in violation of the Firearms Act, possession with intent to distributed marijuana and cocaine, and possession of a firearm in furtherance of a drug trafficking offense. (Doc. 1.) Lugo contends that his Fourth, Fifth, and Sixth Amendment rights were violated requiring suppression of the evidence found in his vehicle and statements made while he was in custody. The Court held a hearing on November 7, 2019. After consideration of the parties' briefs, exhibits, the testimony of Montana Highway Patrol Trooper David Morris, and the arguments advanced at the hearing, the Court denies the motion.

1

## Background[1]

At approximately seven p.m. on August 28, 2017, Montana Highway Patrol received a call reporting a possible drunk driver on I-90. The caller reported that a baby blue Chevrolet pickup was swerving and speeding outside of Bozeman, Montana. Trooper Morris responded to the call. As he approached the truck, he noticed that it had Texas plates, a missing mirror, and held two men and a dog. When the vehicle veered into the left lane without signaling, Trooper Morris activated his lights and siren to initiate the stop. (Doc. 20-1 at 1–2.) Roughly thirty seconds later, the driver, Lugo, glanced in his rearview mirror, noticed the trooper, and pulled over. Despite a wide unobstructed shoulder, Lugo positioned his vehicle in the center of the shoulder causing the driver's-side door to hug the traffic lane to its left. (Docs. 21; 20-2 at 2.)

Trooper Morris approached the vehicle and asked for Lugo's driver's license, registration, and proof of insurance. (Doc. 21.) Lugo produced his Texas driver's license but did not have the other documentation. (*Id.*) As they spoke, Trooper Morris detected an odor of raw marijuana coming from the vehicle. (Doc. 20-1 at 2.) He also noticed a glass gar containing marijuana on the center console

---

[1] Where no citation to the record is provided, the facts are derived from Trooper Morris' testimony at the hearing.

of the dashboard,[2] and that the car had a "lived-in look." (*Id.*) Lugo was visibly nervous, and his hands were shaking. (*Id.*) Unprompted, Lugo spoke in rapid succession, informing the trooper that he had just been in Washington at his Aunt's house, that he was headed to Colorado to visit friends, and that he was a 100% disabled veteran. (Docs. 20-1 at 2; 21.)

Trooper Morris then ordered Lugo to step out of the vehicle. (Doc. 21.) Lugo opened the door causing the trooper to step backwards into the lane of traffic. (*Id.*) As Lugo exited the vehicle, Trooper Morris observed a handgun in a seat pocket on the driver's side. (Doc. 20-1 at 2.) He asked if he could hold on to the gun during the stop, and Lugo confirmed that this was okay. (Doc. 21.) Lugo also indicated that there was an unloaded assault rifle behind the driver's seat. (*Id.*) In light of the weapons, Trooper Morris asked Lugo to wait by the hood of the patrol car while he spoke briefly with the passenger and assessed the situation with the other gun. (*See* Doc. 20-1 at 2.) He then frisked Lugo for additional weapons. (Doc. 21.)

Lugo was visibly nervous. (Doc. 20-1 at 2.) He expressed that he had PTSD and asked the trooper to feel his heartbeat. (Doc. 21.) Trooper Morris

---

[2] At the hearing, there was some dispute over whether it would have been possible for someone standing at Lugo's door to see the glass jar from that vantage point. (*See* Doc. 29-1 at 2.) Trooper Morris testified under oath that he saw the jar when Lugo leaned over to search for his documents. Not only did the Court find Trooper Morris to be credible, but any discrepancy in the subsequent photographs may be explained, as Trooper Morris did, by the fact that items often shift during towing.

3

declined and told Lugo to calm down. (*Id.*) He directed Lugo to the front passenger's seat and invited him to keep the door open. (*Id.*) When Lugo continued to communicate his anxiety, Trooper Morris explained that he only intended to issue a written warning for the driving infraction. (*Id.*)

With Lugo in the front seat, Trooper Morris went about the business of issuing a warning and checking Lugo's driving record. At this point, Lugo began to talk: he apologized for his driving, for having a broken mirror, he explained that he intended to get his oil changed and mirror fixed when he got to Colorado, he reiterated his status as a disabled veteran, and explained that he was tired of using pills and opiates which is why he went to Washington to get CBD oil. When Trooper Morris asked what CBD is, Lugo explained that it is part of the marijuana plant that has medicinal properties but does not result in a "high." (*Id.*)

In light of this disclosure, Trooper Morris asked to search Lugo's vehicle. (Doc. 20-1 at 2.) Lugo declined, but offered to turn over the marijuana he had in his car. (Doc. 21.) Trooper Morris explained that he intended to search the entire vehicle and would call a canine unit. (*Id.*) Lugo began to panic. (*See id.*) He told the trooper he might have a heart attack, and he did not "want to be incriminated for having a little marijuana." (*Id.*) Lugo again asked the trooper to feel his heartbeat and though the trooper declined, he could see the vein on Lugo's neck pulsating. (*Id.*) Lugo volunteered the search of his body instead and offered to

4

give up his vape pens. (*Id.*) While this was going on, Trooper Morris continued to process the paperwork related to the traffic warning. (*Id.*) As the back and forth continued, Lugo pleaded with the officer not to search his car and expressed his fear that he would have a heart attack. (*Id.*)

It was at this time that Trooper Morris elected to provide a Miranda warning. As the trooper advised Lugo of his rights, Lugo repeatedly interrupted: "Why am I being arrested?" "What am I being detained for?" Still in the middle of his warning, Trooper Morris clarified that Lugo was being detained for having marijuana but he was not under arrest. When he continued the warning and informed Lugo of his right to counsel, Lugo immediately responded, "I want a lawyer." (*Id.*)

Trooper Morris once again told Lugo that he was not under arrest and that both he and his passenger were free to leave but that his vehicle was being detained. (*Id.*) Trooper Morris then asked Lugo how he knew the passenger. From here, things became chaotic. (*See id.*) Lugo and Trooper Morris both exited the vehicle, the passenger was instructed to leave the truck and apprised of the situation. (*Id.*) Lugo and the passenger began to argue with Trooper Morris and another officer who had arrived at the scene. (*Id.*) Lugo expressed his belief that the officers lacked the ability to search his vehicle and that his constitutional rights were being violated. (*Id.*) Lugo requested the name of the trooper's supervisor

5

and then stated that he would not leave the scene until the supervisor arrived. (*Id.*) As things began to escalate, Trooper Morris warned Lugo that he could not get into his vehicle and briefly placed him in handcuffs on the assertion that he would arrest Lugo for obstructing justice. When Lugo agreed to calm down and leave the scene, Trooper Morris removed the handcuffs. Sometime thereafter, Lugo and the passenger left the scene and began to walk to town.

After the traffic stop, Trooper Morris towed the vehicle into town, and applied for and received a warrant to search the truck, which lead officers to recover marijuana, cocaine, a digital scale, and a ledger.

## LEGAL STANDARD

The proponent of a motion to suppress bears the burden of showing by a preponderance of the evidence that evidence was obtained in violation of his or her constitutional rights. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389–90 (1968)); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

## DISCUSSION

Lugo argues his Fourth Amendment rights were violated when Trooper Morris ordered him to leave his truck on a mere hunch of criminal activity, and because the trooper lacked probable cause for the prolonged seizure of his vehicle. (Doc. 20 at 10–12.) Lugo additionally argues that the Court should suppress his

statements because Lugo was rendered in custody when he was ordered from his truck but was not given a Miranda warning at that time.[3] (Doc. 20 at 12–14.)

## I. The Fourth Amendment

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A brief investigatory stop, otherwise referred to as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 9 (1968), complies with the Fourth Amendment where an officer has reasonable suspicion to believe "that the person stopped is, or is about to be, engaged in criminal activity," *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Reasonable suspicion requires more than a "mere hunch" of criminal activity. *Id.* at 274.

Lugo does not take issue with Trooper Morris' initial justification to instigate the traffic stop. Rather, he argues that Trooper Morris lacked the reasonable and particularized suspicion necessary to pull Lugo from his vehicle, which he argues is a "discrete constitutional event." (Doc. 20 at 10.) Lugo acknowledges *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (per curiam), but

---

[3] Lugo argues that both his Fifth and Sixth Amendment rights were violated during the encounter, however, the Sixth Amendment attaches only when prosecution has commenced. *Texas v. Cobb*, 532 U.S. 162, 166 (2001). Because the conduct at issue occurred prior to any formal charges, the Court will address Lugo's arguments under the Fifth Amendment.

seems to argue that officer safety notwithstanding, Trooper Morris acted on a mere hunch of criminal activity when he ordered Lugo from his vehicle.

The "touchstone of [the Supreme Court's] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Mimms*, 434 U.S. at 108–09 (quoting *Terry v. Ohio*, 88 S. Ct. 1868, 1878–79 (1968)). In *Mimms*, the Court determined that it was reasonable for a police officer to ask a driver he had stopped to step out of his vehicle because doing so was a "de minimis" curtailment of the individual's rights when balanced against the officer's safety concerns. *Id.* at 110. *Mimms* did not require that the officer have reasonable suspicion to justify his decision to pull the individual from his car—it was enough that the officer made such a demand to promote his own safety. *See id.*

Here, as in *Mimms*, it is irrelevant whether Trooper Morris had any further suspicion to investigate criminal activity when he ordered Lugo from his vehicle. Trooper Morris testified that it was his typical practice to ask individuals to accompany him to his patrol car when processing a citation. Here, such a request was imminently reasonable given the fact that this traffic stop occurred along a busy interstate. Because Lugo had not pulled very far onto the shoulder, Trooper Morris stood with his back just inches from the lane of traffic as he spoke with Lugo beside the vehicle. Taking Lugo back to his patrol car where he could issue a

8

citation from a position of safety is precisely the sort of safety decision that is reasonable under *Pennsylvania v. Mimms*.

There is an additional question of whether the duration of the traffic stop exceeded the scope reasonably permitted by the Fourth Amendment.[4] "A seizure justified only by a police-observed traffic violation, . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015). In order to "prolong" a traffic stop to conduct a canine sniff of the vehicle, an officer must have additional "independent reasonable suspicion justifying each prolongation." *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015).

While the traffic stop here was undoubtedly prolonged—Trooper Morris concluded the "traffic mission" at the time he provided Lugo with the Miranda warning but did not release the vehicle at that time—nothing in the seizure of Lugo or his truck violated the Fourth Amendment. While the traffic stop was ongoing, Trooper Morris smelled raw marijuana and observed a glass jar containing marijuana which, coupled with his observation that the vehicle had a "lived-in

---

[4] Lugo argues that the warrantless seizure of the vehicle violated his Fourth Amendment rights. It is not entirely clear whether Lugo means to argue that the seizure of his vehicle prolonged the stop, which is the interpretation taken by the Government, (Doc. 24 at 6–7), or whether he means that upon conclusion of the traffic mission, Trooper Morris needed probable cause to continue to seize his property as evidence of a crime or contraband as required by *Soldal v. Cook County, Illinois*, 506 U.S. 56, 69 (1992). The Court will address both contentions.

9

look," provided him with the additional reasonable suspicion required to detain Lugo to conduct an investigation into suspected possession of illegal substances.[5] By the time the traffic stop concluded, Lugo had confessed to having marijuana in the vehicle, and had offered to hand over his CBD oils and vape pens. This information coupled with the presence of a firearms, out of state plates, a multi-state travel agenda, the "lived-in look" of the vehicle, and Lugo's abnormally nervous behavior provided Trooper Morris with probable cause to seize the vehicle as evidence of a crime. There was no Fourth Amendment violation in the seizure of Lugo or his vehicle at any time during the stop.

## II. The Fifth Amendment

A Miranda warning is required when an individual is in custody and subject to interrogation. *Miranda v. Arizona*, 384 U.S. 436, 495–96 (1966); *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013). "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of

---

[5] At the hearing, Trooper Morris conceded that it is not the department's policy to arrest an individual upon suspicion of misdemeanor possession of marijuana. While subjectively, Trooper Morris may have decided that none of the information provided by Lugo gave rise to an arrestable—and by extension searchable—offense, the Supreme Court has rejected the notion that the probable cause determination to search or seize is limited to the officer's subjective beliefs or decisions. *Whren v. United States*, 517 U.S. 806, 813 (1996). "The standard for determining whether probable cause or reasonable suspicion exists is an objective one; it does not turn . . . on the subjective thought processes of the officer . . . . If, for example, the facts provide probable cause or reasonable suspicion to justify a traffic stop, the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense." *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (citing *Whren*, 517 U.S. at 812–13 (1996)).

coercion." *Howes v. Fields*, 565 U.S. 499, 509 (2012). An individual may be in "custody" even though they are not yet formally arrested. *See id.* "[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) (quoting *California v. Beheler*, 463 U.S. 1121 (1983)). Though an individual is "detained" during a traffic stop, a traffic stop is typically a noncustodial event, though it may become custodial depending on the facts and circumstances. *Berkemer v. McCarty*, 468 U.S. 420, 439–40 (1984). In the context of a *Terry* stop, the inquiry is whether a "reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). This is an objective inquiry. *Yarborough*, 541 U.S. at 662 (indicating that the objective standard does not "place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question."). The first step of which is to determine whether there is a restraint on the individual's freedom of movement. *Howes*, 565 U.S. at 509. Other factors to be considered are "the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and the degree of pressure applied to detain the individual." *Booth*, 669 F.2d at 1235.

11

Generally, Lugo contends that his statements should be suppressed because he was in custody early in the encounter and was not given a Miranda warning until after he had made inculpatory statements. (Doc. 20 at 12–13.) Lugo seems to assert that he was placed in custody as soon as he was ordered from the vehicle because this is when his freedom of movement was restrained as evidenced by Trooper Morris' instructions to leave his vehicle, to stand by the hood of the patrol car, to wait for his pat down, and then to sit in the front seat. Because Trooper Morris was orchestrating Lugo's movement at each of these steps, Lugo asserts that he was placed in custody.[6]

Though it is clear that Lugo's freedom of movement was constrained by the encounter, the Court finds these constraints commensurate to a noncustodial roadside detention. While Lugo's anxiety indicates that subjectively he felt a high degree of pressure, none of the objective factors as described by the Ninth Circuit indicate that this encounter contained the sort of coercive pressures that require a Miranda warning. First, Trooper Morris remained calm during the encounter and did not raise his voice when he directed Lugo from the vehicle and told him where to stand. When Lugo communicated his anxiety and asked the trooper to feel his

---

[6] Lugo even argues that Trooper Morris' repeated assertion that he was "free to leave" is illustrative of his confinement because it was conditioned—Lugo argues that he was only free to leave if he calmed down and began to behave. Lugo contends that, though it is counterintuitive, being ordered to leave the scene is emblematic of the custodial nature of the encounter because it is indicative of the physical control that Trooper Morris was exercising over his person.

heartbeat, Trooper Morris attempted to alleviate Lugo's concerns by assuring him that he was not under arrest and would not be given a ticket for the driving infraction. Turning to the second factor, Lugo was not confronted with evidence of his guilt. It was Lugo that disclosed that there was marijuana in the vehicle. As for the third factor, the physical surroundings also do not indicate that Lugo was in custody. Though much of this encounter occurred in a patrol car, which may be a more intimidating environment for Lugo than his own car, Lugo was placed in the front seat as opposed to the back seat, was invited to leave his door open, and was assured numerous times that he was not under arrest. Finally, Lugo was only detained for approximately fifteen minutes, and the degree of pressure applied by Trooper Morris was the typical pressure associated with a traffic stop.

The only additional factor that weighs in favor of finding Lugo in custody is the fact that he was given a Miranda warning. *See Tukes v. Dugger*, 911 F.2d 508, 516 n.11 (11th Cir. 1990). While an officer's issuance of a Miranda warning is not dispositive of whether an individual is in custody, many courts consider it to be an important factor in the analysis because a reasonable person who receives a Miranda warning is likely to believe they are under arrest. *United States v. Bautista*, 145 F.3d 1140, 1148 (10th Cir. 1998); *Tukes*, 911 F.2d at 516 n.11; *see Anderson v. Terhune*, 516 F.3d 781, 783 (9th Cir. 2008) (acknowledging that the Miranda warning is so engrained within popular culture that everyone knows that it

accompanies an arrest); *but cf. United States v. Lewis*, 556 F.2d 446, 449 (6th Cir. 1977) ("The precaution of giving Miranda rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for Miranda purposes."). However, any coercive effect of being given a Miranda warning is tempered by the fact that Trooper Morris immediately reassured Lugo that he was not under arrest and that he and his passenger were free to leave. The Court agrees with the Government that Lugo was not placed in "custody" until he was handcuffed.

Having concluded that Lugo was not in custody at the time he indicated that he "wanted a lawyer," the question becomes whether this statement has any legal significance. "[T]he Fifth Amendment right to counsel under Miranda does not vest until a defendant is taken into custody." *United States v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992). If a defendant invokes their right to counsel prior to being placed in custody, the reference to a "lawyer *at that time* cannot be considered an invocation of *Miranda* rights." *Id.* (emphasis added); *see also United States v. Harrison*, 213 F.3d 1206, 1209 (9th Cir. 2000), *as amended* (June 29, 2000) (addressing the Sixth Amendment right to counsel and explaining that "[a]ttachment and invocation are distinct legal events" and generally "attachment must precede invocation in time"). Here, Lugo's attempted invocation of a right to

14

counsel was ineffective at that time because his right to counsel had not attached. Therefore, Lugo's statements in response to Trooper Morris' question regarding how he knew the passenger (which occurred after he was given a Miranda warning but before he was placed in custody) do not require suppression. There was no violation of Lugo's Fifth Amendment rights.

IT IS ORDERD that Lugo's Motion (Doc. 19) is DENIED.

DATED this 19th day of November, 2019.

Dana L. Christensen, Chief Judge
United States District Court